### IN THE

# SUPREME COURT

### OF

# NEW JERSEY,

## APRIL TERM, 1789

[403]                    THE STATE v. LYON.

1. A *habeas corpus*, to try a negro's right to freedom, ought not to issue without the court or judge is satisfied that the case is a proper one; but it is not necessary that the preliminary facts should be proved by affidavits.

2. The court will not require the prosecutor to enter security for costs in a case of *habeas corpus*.

3. Oral testimony will be heard by the court, as well as written, on a case of *habeas corpus.*

4. Where a party is surprised by the case proved, time will be allowed him to prepare testimony to meet it, at the same time that due care will be taken to provide against the dangers of such a practice.

5. Under what circumstances a manumission will be presumed.

This was a *habeas corpus*, commanding the defendant to bring up the body of Margaret Reap, whom he detained and claimed as a slave.

On the return of the writ, *Williamson*, for defendant, moved to quash the writ, on the ground that it had been issued

*improvidé,* without any affidavit being filed or cause being shown.

In civil actions, the *habeas corpus* to remove a cause from an inferior court issues of course, and there is no necessity to lay before the court any special circumstances to authorize this proceeding, but when the writ is issued for the purpose of examining a question of property or trying the rights of parties, before they can be required to come forward to prove their title or incur the expense and trouble which such a call imposes, it is necessary and highly reasonable that some [404] grounds should be shown to satisfy the court that it is proper and necessary. In this case no such ground has been disclosed, and it has not been made to appear that there is any reason to question the title of the defendant. 3 *Bl. Com.* 129, 131–2; 1 *Bl. Rep.* 412; 1 *Burr.* 636–7, show that an affidavit is the proper course.

*Woodruff* (attorney general), *contra,* cited 1 *Bl. Rep.* 386; 3 *Bl. Com.* 130.

CHETWOOD, J. When the question was first stated, it struck me that a distinction might be thought to exist between cases where the writ issued in the vacation, and where it issued in term; but, upon reflection, I am satisfied that the same principle must exist in both cases. In the first case, it is necessary that the judge should be satisfied before the writ is allowed, and the court in the latter. Neither of them ought to act without some probable cause being exhibited, to raise at least a reasonable question as to the legality of the claim under which the negro is detained. But there is no authority for confining the mode of showing this probable cause to any one course, whether by affidavit or otherwise; nor is there any reason for this restriction. I signed the writ in the present case during the vacation, and I was at the time perfectly satisfied of the propriety of allowing it.

SMITH, J. There must have been some ground exhibited to

the judge who allowed this writ, or unquestionably he would not have done it. We cannot presume that he would have acted without some sufficient motive; but it is perfectly immaterial in what manner he obtained the information upon which he acted. It would have been an adequate ground if he knew the circumstances of the case from his own personal knowledge, and in such a case it would have been wholly unnecessary and superfluous to have required testimony to be produced to inform him of facts which he previously knew.

For the defendant it was then moved that he should not be compelled to answer the writ until security was given that the [405] costs should be paid in case the negro should be adjudged a slave.

*Woodruff* and *R. Stockton, contra.* This is a prosecution at the suit of the state brought on the complaint of one of its citizens illegally deprived of his liberty. In cases of this kind the state is bound to protect the rights of all who are within its dominion, and fulfil the duties which are imposed by the social contract. The obligations of allegiance and protection are reciprocal. Whenever, therefore, an individual is deprived of his freedom, the state is bound to interfere to assist in extricating him from his confinement, and there is no individual who can be called upon to enter a security of the kind required. The state neither can nor will bind itself to defray the expenses of the prosecution, and it would be impossible to force it upon a private member of the community. The effect of the measure which the court is called upon to adopt will be, to prevent entirely the relief intended to be afforded by this writ unless the unfortunate victims can themselves procure the means of defraying this extraordinary and preliminary expense. Their situation, already sufficiently distressing, will be seriously exasperated, and that liberty which it is the object of our government to protect, and of our laws to promote, will be oppressed and destroyed.

Nor are there any grounds to warrant the adoption of such

The State v. Lyon.

a measure. It is novel and unprecedented. By the common law no costs were allowed, and the statutes which give them do not apply to cases of this description. The question has been once before stirred in this court, in the case of *The State* v. *Oliver et ux.*, September Term, 1787, but it was then rendered abortive, and the decision then given ought to be conclusive.

SMITH, J. I perfectly well remember the case of Oliver and wife which has been alluded to. The point now urged was pressed with much zeal by the counsel for the then defendants, but it did not receive the sanction of the court. We cannot but think that to require security in such cases, would be, in effect, considering the destitute and friendless situation of every negro who is claimed as a slave, tantamount to a denial of the writ. The motion must be overruled.

[406] In support of the claim to freedom preferred by the negro, various testimony was produced, some of which being parol—

*Williamson* objected—that the admission of oral testimony in cases of this description was improper. All the facts requisite to support the claim for freedom should be reduced to writing and attested in the form of affidavits; the court cannot afford the time to listen to a tedious examination of witnesses when other business is pressing for their attention. Juries hear *vivâ voce* testimony, because it is peculiarly adapted to their capacities and habits, but the universal practice in England is for courts to proceed upon written evidence. Upon a *habeas corpus* in civil cases special circumstances are disclosed by affidavit. Cases of *certiorari* are always examined in the same manner; all motions in which it is necessary to establish certain facts as the ground for the court to adjudicate upon, follow the same practice. Indeed if the court were to undertake to listen to parol testimony in all these cases, the course of business would languish and the interests of the suitors suffer.

2 G

PER CUR. It has been the constant practice of the court in cases of this kind to hear *vivâ voce* testimony when offered. The general principle in the admission of evidence is, not that courts are restricted by narrower rules in receiving testimony than juries are, but that they being able to discriminate between that which ought to be listened to, and that which should be disregarded, are not prohibited from hearing any evidence which they may think calculated to illustrate the subject before them. (a) The objections that have been urged apply wholly to the convenience of the judges, and when we find it necessary to adopt another course, [407] that we may be enabled to get through the business before us, we shall give previous notice, that no inconveniences may result from an alteration of the practice. At present, however, no such necessity exists, and, as it has been customary, in all cases of this kind, to receive parol testimony, we do not think proper, at this time, to introduce a new rule.

The evidence produced on the part of the negro was—

1st. A deed of gift dated March 1st, 1750, from Zaccheus Mayew, of Massachusetts, to Lucy Little, then the wife of ——— Little, by which he conveyed to her his title to Flora, a negro girl, the mother of Margaret.

2d. That the said Lucy Little, being afterwards a widow, and having one son, named William Little, intermarried, in Massachusetts, with a certain Dr. Joseph Eaton, and that they came together to Shrewsbury, in New Jersey, and brought Flora with them.

. (a) In the case of the *State* v. *McDonald and Armstrong, ante* 332, the court proceeded upon the same principle, which has also received the sanction of Chief Justice Tilghman in *Shortz* v. *Quigley,* 1 *Binn.* 222, 224, who says, "This is an appeal to the court to exercise a summary jurisdiction on principles of equity. In hearing these motions courts are not tied down to those strict rules of evidence which govern them in trials by jury, because it is presumed that their khowledge of the law prevents their being carried away by the weight of testimony not strictly legal."

3d. Dr. Eaton, August 31st, 1752, by an assignment of the deed of gift, sold Flora, with a child she then had, named Rose, to John Worthley, who, on the 27th September, 1753, by bill of sale, conveyed her to John Williams.

4th. Williams sold Flora again to Dr. Eaton, on the 8th of May, 1754.

It was further proved, by the affidavits and testimony of several ancient witnesses, that Dr. Eaton, about the time that he purchased Flora from Williams, and repeatedly afterwards, declared that he was principled against slavery; that he never intended Flora to belong to his estate, nor should any of his children be entitled to hold her as their property. Lucy Eaton survived her husband, and, a short time after his death, sold a spinning wheel which belonged to her, saying that she had no further use for it, having set Flora free, who used to spin with it. Since that period, Flora has been considered, in the neighborhood, as a free woman. No claim to hold her as a slave was heard of for seventeen years. She worked as a free woman, in the neighborhood of the widow Eaton, and occasionally for her, and for the wife of John Eaton, the eldest son of the doctor, who always paid her wages. During this period, she married Joseph Reap, a free negro, with whom she has since lived, and continues to live. That Flora, since her [408] marriage with Reap, had two children, one named Lydia, the other Margaret, the present applicant. These children lived with their parents, and were brought up by them from the fruits of their own industry, and continued with them until Margaret was seized and carried away forcibly. Since this occurrence, an instrument has been executed by William Little, the son-in-law of Dr. Eaton, by which he relinquishes all his title and claim to Flora and her children, and manumits them, so far as regards any rights belonging to him.

The only evidence offered on behalf of the defendant, was an affidavit taken *ex parte*, without notice to any one interested for the prosecution, and without being entitled as of

any cause in court. Upon these grounds, its admission in evidence was objected to by the attorney general.

*Williamson, contra.* No notice is necessary, in cases of this kind. The uniform practice is to read the affidavits with which the party may be prepared at the opening of the case, and, when it is requisite, a day is given to the adverse party to answer them. The reason is obvious, and shows it is impossible it should be otherwise. There are no pleadings in the case, no issue or notice, in any shape, by which the party can be forewarned to what point he must prepare his testimony. Unless, therefore, the cause is heard in this manner, both parties are liable to be surprised, without any laches or negligence on their part; a claim may be preferred, of which no previous suspicions were entertained; a defence set up, which was never anticipated—though both may owe their strength to the very circumstance of the ignorance of the opposite party. Time is, therefore, always allowed to answer the matter contained in the affidavits. 1 *Bl. Rep.* 412, *The King* v. *Delaval and others;* 1 *Burr.* 636, *Rex* v. *Dawes.*

Admitting that notice was necessary, to whom was it to be given? To notify the negro that on such a day particular persons would be examined in relation to his case, would be merely a form, and would not answer the purposes for which notice is ever required. It is a matter perfectly notorious to every one, that in cases of this kind, the state is formally made a party to the suit, but its officers never, or rarely, interfere [409] officially; notice to the attorney general would therefore, in most cases, be equally nugatory. No prosecutor's name is ever endorsed upon the writ, or appears in any other manner to the defendant, and he is therefore absolutely prevented from notifying any individual to whom the giving such notice would not be a mere idle ceremony.

*R. Stockton,* against the admission of the evidence. The general rule of law is clear, that *ex parte* testimony is illegal and inadmissible; that no one can be affected by evidence

taken without his knowledge, and without an opportunity having been afforded him to cross-examine the witness. The cases cited from the English books are inapplicable. The practice there is to examine cases of this kind altogether upon affidavits ; here, the witness may be produced. Even in England, however, the cases do not prove that the affidavits are admitted without notice having been given that they were to be taken, for, though time is sometimes allowed to rebut the testimony that has been adduced, it does not appear that this is to be done by taking counter affidavits of the same witnesses.

To say that this is a state prosecution is no answer to this objection. The name of the attorney general is endorsed on the writ, as the prosecutor, and notice to him, in his official capacity, may legally be given. The difficulties in the way of serving the notice, however, will not alter the rule of law, and affect the claimant's right to her liberty, without a full opportunity being afforded her to cross-examine the witness.

PER CUR. This evidence has been objected to on the ground that it is *ex parte*, and taken without any notice being previously given to the person against whom it is designed to operate. The party adducing it is bound to show that the testimony is legal, and taken in a mode conformable to law. The fact which constitutes the ground of objection has not been denied, and as we are not satisfied that there exists any reasons to take it out of the general rule, the evidence must be overruled.

The evidence with which the defendant was prepared, being rejected, he moved for an adjournment of the cause, that [410] he might prepare the proof necessary to support his claim. The evidence that has been heard establishes the fact that after several conveyances, the title to Flora, the mother of the applicant, became a second time vested in Dr. Eaton. Upon his death, unless there was a legal manumission of the slave, she must be considered as constituting a part of his personal estate, the right to which became vested in his re-

presentatives, or, in case of a bequest by his will, must go to the legatee. The evidence going to establish the fact of manumission, does not lead to the supposition that the manumission proceeded from any other person than the widow of Dr. Eaton, or her son, William Little. There is a material chasm, therefore, in the testimony, it not being proved that either of these individuals had any right of which they could legally dispose. The defendant had no previous notice of this deduction of title, and could not be prepared with evidence to rebut it. It is but reasonable, therefore, that he should be allowed time to ascertain the contents of Dr. Eaton's will, to show from it that no title or right was given to his wife or son-in-law, and therefore that no claim to freedom can be supported under a manumission by either.

*Woodruff*, (attorney general,) *contra*. This application ought to be denied upon two grounds :

1st. The title of Dr. Eaton to Flora is acknowledged by this very application. The defendant claims to detain the daughter as a slave; if this claim has any legal foundation, it must be derived either mediately or immediately under Eaton. The defendant must be presumed connusant of his own title, and therefore the facts disclosed cannot be a surprise.

2d. It would be as dangerous as it is unprecedented to permit a party, after a cause has been opened and evidence heard, after the witnesses have been examined and cross-examined, to have an adjournment of the cause, that he may supply himself with proofs to rebut this testimony. 

*Stockton*, on the same side. There is no doubt but that a court, upon proper grounds, and under certain circumstances, will interpose their discretionary powers to prevent either party from being surprised or entrapped; but it is equally clear [411] that it will in no case permit a party, after being apprised of the case and proofs of his adversary, to have further time to prepare his testimony to meet the case which has been disclos-

ed. The facts stated by the attorney general show clearly that there can be no surprise, if the defendant's claim has any legal foundation; and if it is a right of mere possession—a claim to detain an unfortunate being in slavery without a shadow or pretence of title, it is certainly not a claim for the protection of which a court will interpose its extraordinary powers, or authorize any departure from the ordinary rules of practice.

Though it is true, as has been urged, that there are no formal pleadings in cases of this kind, it does not necessarily follow that a party may not be as well prepared to establish his case as in any civil action. The question in controversy is simply this—Is the claimant detained legally or illegally? and the party must always know his own title and be prepared to show it. If an action of detinue had been brought for this negro by a third person, the point in issue could not be more simple or unembarrassed, and assuredly the court, in that case, would not listen to an application to adjourn the trial after evidence had been given, that the opposite party might prepare himself to rebut it. This case stands on the same principles, and ought to be governed by the same rules. A *habeas corpus* is, to one of these blacks illegally detained in slavery, precisely what an action of detinue is in ordinary cases: in both, the defendant may be, and should be, prepared to answer the charge, and to show the grounds upon which his claim rests.

*Williamson* in reply. The similarity which has been said to exist between this case and the action of detinue, is wholly imaginary. In the latter, the party is apprised of the claim, and is informed by whom his rights are questioned; here the writ is general; no claim of freedom appears on the writ, nor if he should suspect that such is the object, will be able to imagine upon what foundation it rests. He cannot ascertain the grounds on which the writ issued until the circumstances of the case are actually laid before the court. The cases [412] are widely different in all their material features, and

arguments drawn from the one are not fairly applicable to the other.

But even in cases of detinue, or in any other civil action where, by the forms of pleading and other preliminary steps, such instances can but rarely occur, the court will not permit the defendant to be ousted of his rights without an opportunity being afforded him of rebutting any unforeseen claim; and the plaintiff is always permitted, by suffering a voluntary non-suit, to parry the effects of an unexpected defence. In this case, a judgment against the defendant will be conclusive; no new trial can be granted; the rights of the party must be protected now, or the opportunity will be forever lost. This is, it is true, a question in which the liberty of one individual is at stake, but it also involves the rights of property claimed by another: both are entitled to the protection of the law, and while the court are watchful in guarding the one, they will be careful not to invade the other.

PER CURIAM. This is a question of considerable importance; one which we should be unwilling to be looked upon as settling by an opinion delivered on the spur of the occasion. No great inconvenience can result from allowing the defendant, under the peculiar circumstances of this case, an opportunity of producing the will of Dr. Eaton. We are therefore of opinion that time should be allowed him for that purpose, (a) but as we think it would be establishing a dangerous precedent to extend this permission further, no other testimony will be admitted.

On the following day, the counsel for the defendant informed the court that he had examined the will of Dr. Eaton, but, not finding it to answer his purposes, thought it unnecessary to produce it; and on being called upon by the attorney general to exhibit its contents, he refused.

*Woodruff* and *Stockton.* By the chain of title that has

(a) See *Howard* v. *Richman and Rhea.,* ante 139.

been exhibited in this cause, the person in whom the absolute right to Flora was shown to exist was Dr. Eaton, yet under the strong circumstances of the case, a legal manumission or [413] dereliction of the property may be presumed from the facts that have appeared in evidence. The declarations of Eaton as to the views with which he bought back Flora, his avowal that his principles were opposed to slavery, the great length of time during which Flora has enjoyed her freedom, being upwards of seventeen years, not privily or clandestinely, or in a situation where she was unknown, but openly, notoriously, in the neighborhood and in the family of her former owner, receiving wages from them as a free woman, marrying a free man, rearing children to maturity without interruption and without assistance, the refusal on the part of the defendant to produce to the court the will of Dr. Eaton, are so many circumstances leading to the presumption that her freedom was obtained in a legal and satisfactory manner, though it is difficult, or perhaps impossible, at this remote period, to obtain conclusive evidence to the point.

By a series of decisions a rule has indeed been adopted in this court, of a harsh and severe character, that a negro applying for his freedom is compelled to show that he is free; the *onus probandi* is thrown upon him, and doubtless many are detained in servitude in consequence of this rigorous requisition. With this rule, however, we have complied; sufficient evidence has been adduced to authorize this court, exercising the functions of jurors and of judges, to presume an actual manumission. Courts of law may presume any fact or any link in a chain of title after a lapse of time. Acts of parliament, grants, records, instruments of the highest character in the law have been presumed to support a title founded in length of possession; and surely under the authority of such precedents a manumission, which if merely oral will be sufficient, may be presumed in favor of the rights of human nature after a peaceable and uninterrupted enjoyment of freedom for seventeen years. 2 *Shower* 47 ; *Mayor of Hull* v. *Horner, Cowp.* 102 ; *Bedle* v. *Beard,* 12 *Co.* 4, 5.

If the widow of Dr. Eaton was the person in whom the legal title to Flora was vested subsequent to the death of her husband, there is sufficient evidence to presume an actual manumission from her. She relinquished her right to the la-[414]-bor of the negro, compensating her for services rendered, and permitting her to receive remuneration from others.

It is not contended that the ancient law of England, with respect to villains, is strictly applicable to negroes, yet, perhaps, the principle upon which the manumission of a villain was implied may, with propriety, be extended to the case before the court. If a lord contracted with his villain in any manner whereby the latter acquired a right of action, or became invested with an ownership inconsistent with his state or condition of bondage, the law, ever ready to lay hold of the minutest circumstance in favor of freedom, construed this a manumission. His treating his slave as a freeman invested him with the rights of one, and the lord was not permitted to question the consequences of his own acts. 2 *Bl. Com.* 94. Here the mistress contracted with her slave, compensated her for her services, and if the facts are too ambiguous or inconsiderable to be construed a manumission, they at least are strong circumstances to warrant the presumption of an actual former manumission.

The general rule that a negro must disprove every title and establish the fact of his freedom is scarcely applicable to a case of this kind, where the claimant was born of parents openly living in a state of freedom, and in the uninterrupted enjoyment of their liberties. After having been for years in this situation, the defendant has suddenly snatched her away from her parents and consigned her to a state of slavery; the presumption, therefore, is against him, and it lies upon him to show his title and his authority.

*Williamson, contra.* The only question before the court is whether the claimant, Margaret, is or is not free. It has been shown that Flora, the mother, was a slave, transferred

from hand to hand as such, and that her daughter, Rose, has been held in the same condition of servitude. Under such circumstances the applicant is bound to show that her mother was manumitted previous to her daughter's birth, or that the daughter has been manumitted since; and this should be established by evidence as conclusive at least as that which is required to support any other legal claim. In fact the rule is settled that the *onus probandi* lies with the negro; the pre-[415]-sumption is that she is a slave, and therefore evidence of a higher character than ordinary is required in the present case.

But there are here no circumstances to warrant even a presumption of an actual manumission. It is not pretended that Dr. Eaton ever gave Flora her freedom—there is not even the evidence of general report in favor of such a presumption; and if the fact was clearly made out that there had been a deed of manumission executed by Mrs. Eaton, it would avail nothing until it was shown how the title vested in her. There is no evidence of any manumission having been made by Dr. Eaton, or by any one who has shown a title under him to the negro. If the mother was not freed, her children were born slaves, and continue to be so until their freedom is proved.

PER CUR. We have maturely considered the questions involved in this case, and are of opinion that the negro must be discharged.

It is true, as has been contended for the defendant, that negroes claiming their freedom, must prove themselves entitled to it; and this has been the invariable practice of this court. Whatever may be our opinions with regard to the propriety of the rule, we do not think ourselves entitled to change it; but, under the circumstances of this case, we think there is sufficient evidence to establish her freedom.

The declarations made by Dr. Eaton at so early a period, the apparent dereliction of every claim after his death, the express declarations of his widow, immediately subsequent to

The State v. Lyon.

that event, and unmolested enjoyment of freedom, with the uncontradicted reputation of being free, working for herself in the Eaton family and neighborhood, marrying a freeman with whom she continues to live in a state of freedom, and by whom she has had two daughters, whom they have educated at their own trouble and expense—if not sufficient, independent of other testimony, to authorize a discharge, are *prima facie* evidence of the freedom, not only of the mother, but the daughter, sufficient to put defendant on proving a strict legal property. This he has not done, and the court are warranted in granting the discharge prayed for.

Negro discharged.

CITED *in Fox* v. *Lambson*, 3 *Hal.* 275.